Bennett LEVIN

v.

Howard N. GARFINKLE, Barbara Garfinkle, Asher Fensterheim, Cyrus West, K. B. Weissman, Edward Breger, Norman Septimus, Jack Deutschmann, Huckleberry Farm, Inc., Country Realty, Inc., Haw Corporation, Tafu Corporation, Czar Realty Corporation.

Bennett LEVIN

v.

RONDI RIVER REALTY CORPORATION, Howard N. Garfinkle, Asher Fensterheim, Cyrus West, K. B. Weissman, Czar Realty Corporation, Edward Breger.

Civ. A. Nos. 77–3211, 78–3271.

United States District Court,
E. D. Pennsylvania.

June 7, 1982.

Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff.

Jerome J. Shestack, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendants.

## OPINION

LUONGO, Chief Judge.

Plaintiff Bennett Levin brought these consolidated actions to recover from the defendants for fraud, misrepresentation, and breach of fiduciary duty in connection with a series of complex real estate transactions in which the parties were involved from 1975 to 1977. After a non-jury trial in January 1980, I issued my findings of fact and conclusions of law on June 11, 1980. Judgment in Civil Action No. 77–3211 was entered in favor of Levin on November 26, 1980 against various defendants for $573,-405 and for various unliquidated amounts. In Civil Action No. 78–3271, an accounting was ordered to determine the amount to which Levin was entitled from the operation of the Rondi River Realty Corporation. Presently before me is Levin's Consolidated Motion for the Entry of Various Liquidated Judgments. This motion incorporates three prior motions filed by Levin which have been unresolved: (1) Plaintiff's Motion for Entry of Judgment Pursuant to Rule 54(b) against the defendant Alter Ego Corporation (document 412); (2) plaintiff's Motion for the Adoption of the Master's Report (document 436); and (3) plaintiff's Motion for the Entry of Judgment Regarding Certain Indemnities (document 462). I shall deal with each of these motions in turn.

I. *Motion for Entry of Judgment Against the Alter Ego Corporations*

   In my order of November 26, 1980, I entered judgment in Levin's favor against Howard Garfinkle and two other individual defendants. I did not, however, enter judgment either for or against defendants HAW Corporation, TAFU Corporation, Czar Realty Corporation, Country Realty, Inc., and Huckleberry Farm, Inc. Nearly four months after I certified the November 25, 1980 judgment as final, Levin filed his motion to enter judgment against these corporations alleging that they are alter egos of Garfinkle. I must deny the motion as untimely filed.

Recapping the procedural history, the record demonstrates unmistakably that Levin had more than ample opportunity to seek timely relief against the alter ego corporations. At the conclusion of a lengthy non-jury trial, I invited the parties to submit proposed findings of fact and conclusions of law. Levin did submit proposed findings, but did not request specific findings concerning the liability of the alter egos, nor did he ask for relief against them. On June 11, 1980, I filed my findings of fact and conclusions of law, determining that Levin had prevailed on some of his claims but not on others. No findings were made with respect to the liability of the alter ego corporations.

On June 20, 1980, Levin filed a motion for clarification or reconsideration (Document No. 218), requesting reconsideration of several items. No request, however, was made for specific findings against the alter egos. Indeed, the sum and substance of Levin's discussion of the alter egos was limited to the following: "Similarly we would assume that the Court's judgment will run against the various corporations and persons used by Garfinkle, in the event that any assets are left in any of these corporations." (Document No. 218, at 14). On October 16, 1980, I issued a memorandum opinion ruling on Levin's motion for reconsideration (Document No. 238), and ordered that judgment be entered (Document No. 240). Although the judgment concerned several matters, for purposes of this motion it is sufficient to state that judgment was entered in favor of Levin against Garfinkle for $573,405 and for certain other unliquidated amounts. However, judgment was not entered for or against the alter ego corporations.

On October 24, 1980, Levin requested certification of the October 16, 1980 judgment as final under Fed.R.Civ.P. 54(b). In his request, Levin stated that Rule 54(b) certification was necessary because defendants' abuse of process counterclaim remained unadjudicated. (*See* Document No. 244). Three days later, on October 27, 1980, Levin filed a motion to amend the judgment or for new trial. (Document No. 246). Although several errors were alleged in Levin's motion, none of them pertained to the failure to enter judgment against the alter ego corporations. On November 26, 1980, oral argument was heard on Levin's motion to amend the judgment and on his request for certification pursuant to Fed.R.Civ.P. 54(b). Notably, during argument, counsel for Levin stated for the record that defendants' unadjudicated counterclaim was the sole impediment to entry of final judgment:

> Now if Your Honor is prepared to say, well, you think those counterclaims are moot, and you will enter a motion or judgment saying the counterclaims are over and done, then we would not need the Rule 54(b) certification.

(Document No. 316, N.T. at 16). I accepted counsel's assertion that defendants' counterclaim—which obviously involved issues separate and distinct from those already adjudicated—was all that remained to be tried. Accordingly that same day, November 26, 1980, I entered an order granting in part and denying in part Levin's motion to amend the October 16, 1980 judgment, and certified as final the judgment as amended. (*See* Document No. 265).[1]

Appeals were then taken by both Levin and Garfinkle from the November 26, 1980 judgment. Then, on March 23, 1980, while his appeal was pending, Levin filed this motion for entry of judgment against the alter ego corporations of Garfinkle. (Document No. 412). By this motion, Levin seeks to impose liability on the five corporations for (1) the liquidated judgment against Garfinkle in the amount of $573,405, and (2) the unliquidated amounts due Levin from Garfinkle under the November 26, 1980 judgment.

The defendant corporations oppose Levin's motion, contesting the jurisdiction of this court to enter judgment against them at this late date. Several arguments are made by the defendants, but only two merit discussion. First, defendants point out that Levin's motion to enter judgment against the corporations is, in reality, a motion to amend the court's judgment of November 26, 1980. Therefore, defendants contend that the motion is untimely since it was filed well after the running of the ten-day period prescribed in Fed.R.Civ.P. 59(e). Defendants' second and more persuasive argument is that the entry of judgment at this time presents the spectre of a second appeal raising issues identical to those decided by the court of appeals on the appeal from the November 26, 1980 judgment. *See Levin v. Garfinkle*, 667 F.2d 381 (3d Cir. 1980) (per curiam) (affirming the judgment of the district court). Specifically, defendants argue that when I directed the entry of final judgment against Garfinkle, *all* matters central to the issue of the liability of Garfinkle, including the liability *vel non* of the alleged alter ego corporations, were concluded. Therefore, defendants contend that the entry of judgment against them would be improper under Fed.R.Civ.P. 54(b) because the liability issues, in effect, have already been adjudicated and are not subject to revision under the rule.

Levin's argument for entry of judgment against the corporations is largely an emo-

---

1. The order granting Levin's motion to certify the judgment as final pursuant to Rule 54(b) was entered on November 26, 1980. Shortly thereafter, the parties were encouraged to submit proposed findings concerning the entry of judgment under Rule 54(b). Levin did submit proposed findings (*see* Document No. 319), and again indicated that defendants' counterclaim was the only unadjudicated matter remaining in the case. Furthermore, Levin suggested in his proposed findings that certification of the judgment posed "no substantial risk that the reviewing court might be required to consider the same issues a second time." (*Id.*, ¶ 8). Accepting the assertions of counsel that the unrelated counterclaim was the only remaining matter, I issued a memorandum opinion on December 31, 1980, stating my reasons for granting Rule 54(b) certification of the November 26, 1980 judgment.

tional appeal to the equitable jurisdiction of this court to effectuate its judgments. Levin emphasizes the stipulation of the parties that the corporations were in fact controlled by Garfinkle. Furthermore, Levin cites several incidents, supported by the record, of the Garfinkle interests' attempt to circumvent the court's judgment by concealing and dissipating the assets which otherwise could be executed against to satisfy the judgment against Garfinkle. Thus, Levin implores the court to enter judgment against the corporations lest its judgment be rendered meaningless by the Garfinkle interests' deceitful maneuvers.

Apart from the issue of whether there is a sufficient factual basis for concluding that the corporations are indeed alter egos of Garfinkle, Levin argues that it is procedurally proper to enter judgment against them under Rule 54(b), which reads:

> (b) Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Levin maintains that since the November 26, 1980 judgment did not contain an adjudication either for or against the defendant corporations, the judgment was not final as to them.

I do not accept Levin's argument that Rule 54(b) permits entry of judgment at this stage, but if it did grant me the discretion to do so, I would not exercise it under the circumstances here existing. It is apparent from my memorandum opinion of December 31, 1980, as well as from the other circumstances surrounding the direction of the entry of final judgment, that the only matter left to be adjudicated was the abuse of process counterclaims. More importantly, the historic federal policy of avoiding piecemeal appeals militates strongly against entering judgment against the corporations. There can be no dispute that the liability of the defendant corporations is inextricably intertwined with the liability of Garfinkle. Thus, while no express adjudication has been entered with respect to the corporations, it cannot persuasively be argued that the November 26, 1980 judgment did not conclude matters involving the corporations. To hold otherwise, would involve a patent disregard for the policies embodied in Rule 54(b). *See Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980). Indeed, had the court been apprised at the time that Levin intended to seek judgment against the corporations, judgment could not have been certified as final under the rule because the claims certified as final were surely not separate and distinct from the liability of the corporations.

To be sure, my decision that this court should not now enter judgment against the defendant corporations is troublesome. It was never the intention of the court to find in favor of the corporations.[2] The record demonstrates undeniably that the affairs of the corporations were permeated with the personal affairs of Garfinkle. As difficult as it is to sit silent while the Garfinkle interests avoid the impact of the judgment of the court, the procedural requirements of the rules cannot be ignored. I have set

---

2. Of course, my decision to deny Levin's motion for entry of judgment against the corporations in no way impairs Levin's right to execute against Garfinkle's ownership interests in the corporations in order to satisfy his judgment.

forth at length the procedural history which culminated in Levin's present motion. That history shows without question that the court did not rush to final judgment. Over five months elapsed between the issuance of the court's findings and the entry of final judgment on November 26, 1980. During that time, Levin never sought judgment against the corporations, his primary motivation during that period apparently being to obtain a final judgment against Garfinkle since most of Garfinkle's assets, including his ownership interests in the corporations, were located in New York. In addition, counsel for Levin repeatedly represented to the court during argument on Levin's motion for Rule 54(b) certification that only defendants' counterclaim remained to be adjudicated.

Accordingly, for reasons discussed above, Levin's motion will be denied. The principle of finality is indeed a substantial one. The court of appeals has ruled on the great majority of the issues in this case. It would be unwise to reopen those issues by granting Levin's motion at a time when this case, after nearly five years, is finally approaching its completion.

## II. *Motion for Adoption of the Master's Report*

### A. *Background*

As part of the unliquidated judgment entered in this case, I ordered defendants Garfinkle and Fensterheim to render an accounting pertaining to the operation of Rondi River Realty Corporation to determine Levin's share of that venture. In addition, I appointed a special master pursuant to Fed.R.Civ.P. 53 to perform the accounting.

Rondi River's principal asset was an apartment complex in New York City which it operated for a period of almost ten months and then sold for a gain. Levin was a 25% shareholder of the corporation. The principal issue to be determined by the accounting is the amount of money Levin is entitled to receive as his share of the operations of Rondi River and the sale of its principal asset. An additional duty of the master was to determine the extent to which the defendants' practices of siphoning funds away from the corporation and encumbering the corporation's assets with liens to secure personal debts affected Levin's share in the investment.

The master, Elmer I. Rosen, Certified Public Accountant, met with counsel on several occasions and examined all of the records available for the corporation. He also had available to him the transcript and exhibits from the trial before me, as well as my findings of fact with respect to Rondi River. After submitting an initial report, the master met with counsel pursuant to Rule 53(e)(5) to solicit their comments. Thereafter he submitted a supplemental report which discussed the questions raised at his meeting with counsel. Levin now moves for the adoption of the report, subject to certain modifications which he seeks by way of objection to the report under Rule 53(e)(2). Defendants move to reject the report in its entirety or, in the alternative, to modify it in several respects. In addition, defendant Asher Fensterheim contests entry of judgment against him for any amounts due Levin under the accounting. Before discussing the parties' objections to the master's report, I shall address Fensterheim's arguments on liability.

### B. *Liability of Defendant Fensterheim*

■ In my opinion of June 11, 1980, sur pleadings and proof, I concluded that Levin was entitled to an accounting from Garfinkle *and* Fensterheim for the operation and sale of the Rondi River property. *Levin v. Garfinkle* (D.C.Pa.1980) 492 F.Supp. 781 at 820. Now that the accounting has been rendered, Fensterheim's threshold argument is that he has fulfilled the only obligation imposed upon him by the court with respect to Rondi River, and that he should have no personal liability for the amount found to be due to Levin by the master.

Fensterheim's contention that he should have no personal liability under the accounting is rejected. Fensterheim was an officer of Rondi River Realty Corporation, holding the offices of president and vice-

president at different times. He was also a partial owner of the corporation, holding 10% of Garfinkle's interest, or 7.5% overall. In my view, Fensterheim is liable for the amount due under the accounting on two theories. First, Fensterheim is liable because, as an officer of the corporation, he had a fiduciary duty to the corporation and, by extension, to Bennett Levin as a shareholder, to preserve and protect the assets of the corporation. Second, Fensterheim is liable because he actively participated in the fraudulent acts which stripped the corporation of its assets, with full knowledge that the effect of his actions would be to render Levin's participating share worthless.

The record in this case is clear that Fensterheim was intimately involved in the dealings of the corporation. As noted above, he was an officer of the corporation, and in fact replaced Levin as the president without notice to Levin, with the result that corporate activities, including the illicit loans and distributions complained of in this action, took place without Levin's knowledge. As an officer, Fensterheim authorized loans from third parties to the corporation, the proceeds of which went to the personal use of Garfinkle and various Garfinkle entities. Fensterheim pledged corporate funds to secure these loans and allowed the use of corporate funds to make interest payments on them. Fensterheim prepared fictitious minutes of corporate meetings and corporate resolutions approving these transactions. He also approved disbursements of corporate funds to various Garfinkle entities, in some of which he held an interest, and to Garfinkle creditors and family members. Fensterheim personally received $5,625 directly from Rondi funds. He also participated in the issuance of 200 shares of stock, 180 to Garfinkle, and 20 to himself, without issuing Levin shares proportionate to his interest, with the result that Levin was forced to bargain with Garfinkle while settling other claims to receive recognition of his share in the venture. *See* Findings 80–97, 492 F.Supp. at 789–791.

In an attempt to overcome the clear evidence in the record of his responsibility for the condition in which the Rondi River Re-

alty Corporation has been left, Fensterheim advances several arguments. First, he contends that Garfinkle's conduct alone caused whatever injury Levin has suffered. According to Fensterheim, Garfinkle controlled Rondi River, caused the illegal corporate borrowings, and disbursed the moneys "borrowed" by Rondi; Fensterheim's total involvement was merely that of an officer of convenience; he was president of Rondi River solely for the purpose of signing documents. Alternatively, Fensterheim argues that he acted as an attorney for his client, Garfinkle, and cannot be held responsible for any wrongdoing by his client.

Fensterheim's argument that he in no way caused harm to Levin or Rondi River simply flies in the face of my findings in this case. Although my findings adopted Levin's stipulation that Garfinkle controlled Rondi, *see* Finding 12, 492 F.Supp. at 784, I did not find that Garfinkle *alone* controlled the corporation. Finding 12 was not intended to suggest exclusivity of control by Garfinkle, but rather that he exercised control. Indeed, the mere fact that Garfinkle was in charge of the operation does not absolve Fensterheim, as one who did Garfinkle's bidding, of responsibility for his own actions. The record is plain enough that Garfinkle was the mastermind of virtually all of the dealings, but it is equally clear that Fensterheim had a share with Garfinkle in many of the ventures, including Rondi River, and actively assisted him in carrying out his plans. Thus it is unavailing for Fensterheim to argue that he was acting only as an officer of convenience or as an attorney for his client. The role which Fensterheim played in the operation of Rondi River went well beyond that of an attorney representing his client. Fensterheim became an officer of the corporation, and in that capacity was acting on behalf of the corporation, not on behalf of his client, Garfinkle. As an officer, Fensterheim assumed duties *vis-a-vis* the corporation which extended to all of the shareholders of the corporation, not simply to Garfinkle. I am at a loss to understand how Fensterheim, as one trained in the law, can contend

that he was an officer of Rondi merely for the purpose of signing documents. Equally perplexing is Fensterheim's contention that he was merely acting as an attorney for his client, for it is well established that an attorney may not personally engage in unlawful conduct with a client and then escape liability for his own actions simply by claiming that he was serving a client's interests in doing so. Finally, I expressly found that Garfinkle *and* Fensterheim caused the unauthorized borrowings. Findings 277–279, 492 F.Supp. at 804–05.[3]

Fensterheim further contends that his involvement in the irregularities surrounding Rondi River did not cause Levin's losses because, had Fensterheim protested, Garfinkle, as majority shareholder, had the power to replace Fensterheim with another officer who would do Garfinkle's bidding and drain the corporation of funds anyway. I know of no principle of law which allows a defendant who participated in unlawful conduct, whether civil or criminal, to escape liability on the ground that his role would simply have been filled by another party had he himself not participated.

Fensterheim next contends that he cannot be held personally liable under the accounting because he did not personally gain from the distributions from Rondi. Even if I assume that Fensterheim did not personally gain from the distributions, he is nonetheless liable as an officer of the corporation for allowing distributions for non-corporate purposes. Moreover, I reject the contention that Fensterheim did not gain from his involvement in Rondi River. Although he received few direct payments from Rondi funds, he was certainly compensated by Garfinkle for his services in carrying out Garfinkle's orders, and his participation in the affairs of Rondi River was part of his ongoing involvement in various Garfinkle schemes for which he received compensation in various forms. Fensterheim also held an interest in many of the Garfinkle entities to which Rondi funds were directed. *See* Finding 4, 492 F.Supp. at 783. In short, the amount of direct payments received by Fensterheim simply is not an appropriate measure for determining his liability.

Fensterheim also argues that a double recovery will result to Levin if liability is imposed on defendants for the amounts which the master has labelled as "receivables" because Levin had a part interest in several of the ventures which received the illegal distributions. I am not persuaded by this argument. The fact remains that Levin never consented to these distributions. More importantly, had the funds not been drained from Rondi River, they could have been utilized to pursue legitimate corporate opportunities.

Next, Fensterheim contends that Levin waived the observance of corporate formalities by not insisting upon them. This argument, like so many others advanced thus far, is not persuasive. A finding of waiver by Levin would require a finding that Levin had knowledge of the illegal transactions conducted by Garfinkle and Fensterheim. My findings are to the contrary. Levin did not know that shares had been issued in the corporation until *after* the Rondi property was sold. (Finding 263, 492 F.Supp. at 803). Levin did not know that minutes for meetings of the corporation's board of directors had been prepared when no such meetings had taken place. (Finding 271, 492 F.Supp. at 804). Levin did not know that Fensterheim had replaced him as president of the corporation. (Finding 272, 492 F.Supp. at 804). Levin did not know that the corporation borrowed $105,000 from K. B. Weismann in February 1976, secured by a mortgage on the Rondi River property, and that the proceeds of that loan had been dis-

---

**3.** Fensterheim has also contended that my decision at trial not to find a conspiracy to defraud Levin is dispositive of his liability for Rondi River. This does not follow. I did not find that there was a conspiracy because, although plaintiff pleaded a conspiracy and specifically requested that I find one existed, the proof at trial was not directed at establishing a conspiracy, and I concluded that there was not an adequate basis for such a finding in the record. That there is no finding of a formal conspiracy, however, does not mean that Garfinkle and Fensterheim cannot be jointly liable for their conduct with respect to Rondi River.

bursed by Garfinkle. (Finding 274, 492 F.Supp. at 804). Levin did not know that Garfinkle and Fensterheim caused the corporation to borrow an additional $50,000 from Weismann in September 1976, also secured by a mortgage, and that the proceeds of that loan had also been disbursed at Garfinkle's direction. (Finding 277, 492 F.Supp. at 804). Finally, Levin did not know that the Rondi River property had been sold until nearly a month after the sale. (Findings 263–281, 492 F.Supp. at 804). But, most importantly, Levin did make a prompt demand for an accounting from Rondi after learning that the property had been sold. These facts do not support any finding of waiver. Nor am I persuaded by Fensterheim's contention that irregularities in corporate conduct are ordinary occurrences in closely held corporations. While it may be true that certain formalities are sometimes overlooked in non-public corporations, what is at issue here are not mere technicalities but a sustained course of conduct in which the corporation was drained of assets. Moreover, the fact that corporate formalities are sometimes ignored in practice does not mean that a minority shareholder who wishes to assert his rights should be deprived of the protection of corporate formalities, especially where, as here, the defendants' conduct is egregious.

Finally, Fensterheim contends that a judgment in favor of Levin on the Rondi accounting would be premature because (1) no attempt has been made to collect on the receivables from the Garfinkle entities, and (2) the Rondi River Realty Corporation has not yet been liquidated. I reject the argument that the corporation must first pursue collection of the Garfinkle receivables. First, I note that the funds which flowed to Garfinkle were not legally borrowed from the corporation in the ordinary course of business. The funds were simply disbursed at Garfinkle's direction with no regard paid to the formalities of corporate business. Although the master, as a matter of accounting convenience, designated these sums as "receivables," they are not in fact legitimate loans which constitute an asset of the corporation. The simple fact is that the funds were drained from the corporation with Fensterheim's knowledge and acquiescence, and are now, for all practical purposes, gone as far as the corporation is concerned. To suggest that these "receivables" are in some way corporate assets which the corporation can recoup is unrealistic in the extreme.

Second, I will not accept Fensterheim's argument that the Rondi River Realty Corporation must be formally liquidated before judgment can be entered in favor of Levin. The record is clear that as a result of the unlawful activities engaged in by the defendants, Levin has received no return on his investment in the corporation. In addition, the corporation has no assets from which to distribute Levin's share. The corporation for all practical purposes has ceased to exist. Further, because of the defendants, corporate formalities have never been observed. The reality is that Garfinkle and Fensterheim became the corporation, and to insist on the technicality of a derivative suit at this juncture would not only exalt form over substance, but would unfairly give the defendants the benefit of corporate formalities which they have blatantly ignored. Therefore, inasmuch as the master's accounting accurately measures the amount which Levin would have received but for the machinations of Garfinkle and Fensterheim, judgment will be entered in favor of Levin for the amount due him under the master's report as modified by the court.

### C. *Master's Report: Standard of Review*

In a non-jury action, Rule 53(e)(2) provides that the court shall accept the master's findings of fact unless they are clearly erroneous. *See Bennerson v. Joseph*, 583 F.2d 633 (3d Cir. 1978). The master's "conclusions of law" have no effect on the district court except to the extent that they are correct, *In re Mifflin Chemical Corp.*, 123 F.2d 311 (3d Cir. 1941), *cert. denied*, 315 U.S. 815, 62 S.Ct. 804, 86 L.Ed. 1213 (1942), and are, in effect, merely recommendations to the court. The master's ultimate findings involving mixed questions

of law and fact are subject to close review by the court. *In re Continental Vending Machine Corp.*, 543 F.2d 986 (2d Cir. 1976). In this case, because the master was called upon to render an accounting based upon a limited set of records, there are few pure findings of fact, and no issues of witness credibility to resolve. Accordingly, I have closely reviewed the master's report and the records upon which it is based.

### D. Defendants' Procedural Objections to Master's Report

■■■ The defendants first contend that the master's report should be rejected in its entirety because no transcript was made of the proceedings before the master. First, I note that a transcript of the proceedings before a master is not an absolute requirement of the rules, and may be dispensed with in the discretion of the court. *See* Rule 53(e)(1). Second, a party who does not object to the absence of a court stenographer when proceedings before the master commence, with an offer to advance the costs of making a transcript, may not later object to the lack of a transcript. *Bynum v. Baggett Transportation Co.*, 228 F.2d 566 (5th Cir. 1956); *In re A. Maggioli Co.*, 3 F.R.D. 83 (D.Mass.1943); 5A Moore, *Federal Practice*, ¶ 53.10[1] (1980). Finally, and most importantly, defendants have not demonstrated the need for a transcript in this case. As noted above, the master here was called upon to render an accounting, and all of the records which he reviewed were either supplied by the defendants themselves or were those introduced and authenticated at trial. There was no need for live testimony on any crucial issue, and none was heard. Defendants' objection to the absence of a transcript will be denied.

Defendants further object to the report because the master did not file the "evidence and the original exhibits" providing the underlying basis for his report. Rule 53(e)(1). The master has since filed with the court all of the records and exhibits upon which he relied, and therefore defendants' objection in this regard is now moot.

### E. Defendants' Substantive Objections

■ Defendants initially object to the master's determination to include in the accounting interest which should have been paid on the money which the defendants siphoned away from the corporation for their own use. The master traced all of the payments out of the corporation that went to the benefit of Garfinkle interests, and totalled them in one figure he denominated as "receivables" due from defendants to Rondi River Realty Corporation. The master's theory in this regard was that these were corporate funds which should have been available to pursue corporate opportunities redounding to the benefit of the shareholders, including Bennett Levin. The master then proceeded to treat the receivables as if they were loans from the corporation to the Garfinkle interests, and he calculated interest on the net receivables due to the corporation from the Garfinkle interests at the rate of 18%.

The master chose 18% as the interest rate for two reasons. First, 18% was the rate of interest which the corporation was required to pay from its funds to K. B. Weissman for various loans which Garfinkle and Fensterheim obtained for their personal benefit by pledging and using corporate assets. The 18% rate, therefore, serves the function of compensating the corporation for the improper loans arranged with Weissman for the personal benefit of the defendants. Second, as the master also points out, 18% represents the rate which Garfinkle was prepared to pay to his other principal creditor, Weissman, and it should therefore serve as an accurate measure of an adequate interest rate for money "borrowed" from the corporation. In this regard, it is noteworthy that the trial record made it abundantly clear that Garfinkle was not a good credit risk, and could not easily borrow from conventional sources such as banks. Under the circumstances, an 18% interest rate is scarcely excessive, even for the time period at issue, and not to impose an interest rate equivalent to that which Garfinkle would have paid to another lender (*e.g.*, Weissman) would result in a windfall to Garfinkle at Levin's expense.

Defendants object to the imposition of interest on the ground that it is not within the power of the master to award interest, and on the ground that interest may not, in any event, exceed the legal rate of 6%. These arguments lack merit. The master did not "award" interest in the sense that a court awards pre-judgment interest in a case. Rather, he took into consideration as part of an accounting the rather obvious fact that when funds are drained away from a corporation and not available for corporate use, there is a direct effect on the shareholders' equity and the return on their investment. The master employed an interest factor because it was the best means of calculating in a precise way the financial impact of the defendants' practice of siphoning away funds. In my principal opinion in this case, I specifically directed that the accounting to be rendered to Levin was to give consideration to how the various transactions entered into by the defendants with corporate assets affected Levin's interest in the property. 492 F.Supp. at 819. I am satisfied that by imposing an interest charge the master has employed a reasonable means of accounting for the funds drained by the defendants, and his findings and conclusions in this regard will be adopted.[4]

As to the argument that interest must be limited to 6%, I reiterate that what is at issue here is not pre-judgment interest, but rather how to account realistically for the defendants' misuse of corporate assets, which is largely an equitable matter. The master was appointed to employ his particular expertise in financial matters in adjusting the rights of the parties, and he employed an interest calculation simply as an accounting method capable of measuring the impact on shareholders' equity of the loss of funds to a corporation. He did not "award" interest in the sense that defendants suggest, and the legal limitation on

pre-judgment interest is simply not relevant in this context.[5] *See Peterson v. Crown Financial Corp.*, 661 F.2d 287 (3d Cir. 1981). Defendants' objection to the rate of interest employed by the master in determining shareholders' equity will be denied.

Defendants also object to the master's decision not to charge against Levin's interest certain payments ostensibly made from Rondi corporate funds to K. B. Weissman on account of Levin's personal indebtedness to Weissman. The master refused to consider these items on the ground that there should not be charged against the account of Levin, a minority shareholder, payments made to a third party, without Levin's consent, even though the payments were ostensibly made on Levin's behalf.

With respect to one of the challenged payments, in the amount of $10,000, defendants are correct that Levin was given credit for this amount against his indebtedness to K. B. Weissman in my findings of fact and conclusions of law at trial. Therefore, I will adjust the master's conclusions and charge this amount against Levin's interest in Rondi River in order to avoid giving Levin a double recovery. With respect to the other payments purportedly made to Weissman for Levin's account, I agree with the master's decision not to charge Levin. There is no evidence in the record from trial that Levin ever consented to such payments, and he has not received credit for them from Weissman. Accordingly, they should not be charged against Levin's interest as part of the accounting.

Defendants also object to the master's failure to take into account the impact of corporate income taxes in rendering the accounting. The master's reason for refusing to consider possible taxes owed was that returns had not been filed, may well never be filed, and were the responsibility

---

**4.** The method of calculating interest, and the period of time for which interest is to be imposed, are discussed in the next section dealing with plaintiff's objections.

**5.** If the master had awarded interest in the sense that the defendants contend, he would

have calculated 18% on the amount found to be owed by the defendants to Levin. He did not do so, but rather calculated interest on the amount owed by the defendants to the corporation, of which Levin receives his proportionate share.

of the defendants as the management of the corporation. As I instructed the parties at oral argument on the master's report, I am not inclined to consider hypothetical tax liabilities at this stage in the case. Therefore, I will make provision in the order I will issue entering judgment on the accounting, that if the Internal Revenue Service seeks to collect taxes from the corporation, Levin will be subject to an appropriate portion of whatever tax liability is imposed.

█ Finally, defendant Fensterheim raises a separate objection to the master's findings on the rental income generated by the apartment complex while it was operated by the Rondi River Realty Corporation.[6] The master found that the net operating income from the property during the nine and a half months that it was owned by the corporation totalled $95,000, or $10,000 per month. Fensterheim argues that there is no basis for this finding and objects particularly to the master's consideration of a New York City study on average vacancy rates in the year 1975 for property located within the same vicinity as the subject property. In addition, Fensterheim argues that the master should not have considered the net rental income derived from the property during October and November 1976, the first two months after the property was sold by the corporation. Notwithstanding Fensterheim's objections to the master's findings on rental income, I will adopt those findings as the findings of the court. To the extent that there was any impropriety in the factors considered by the master in determining rental income, I note that the master was forced to make certain estimates because of management's failure to maintain proper records. Further, the $10,000 a month net income figure is consistent with my findings at trial. *See* Finding 273, 492 F.Supp. at 804.

### F. *Plaintiff's Objections*

Levin objects to certain aspects of the interest calculations performed by the mas-

ter in determining shareholders' equity. First, he objects to a downward adjustment in interest made in the master's supplemental report. In his initial report, the master calculated the net receivables due from the Garfinkle interests as $481,858 on the assumption that operating income for the property was $154,763. The master later reduced operating income to $95,000, a reduction of $59,763, and therefore in his supplemental report he reduced the amount of net receivables and the interest due thereon by a proportionate amount, 12.4%. Levin does not object to the master's reduction of operating income, and if the revised income figure is correct, and I accept it as being so, a corresponding reduction in interest is necessary. Therefore I accept the master's conclusion that the interest due on the Garfinkle receivables, as stated in the initial report, should be reduced by $28,680, and Levin's objection to the reduction is denied.

█ Levin also objects to the master's failure to extend his calculations beyond May 31, 1979. The master did not consider interest beyond that date because it was the final date for the period of the accounting, and he considered it a matter for the court to decide whether the defendants should continue to be charged interest to the corporation on the amounts they had "borrowed" from it. Levin contends that he is entitled to credit for his share of 18% interest from May 31, 1979, to date. I disagree. There is a point at which Rondi River Realty Corporation, for all practical purposes, ceased to operate as a viable business entity, and therefore ceased losing business opportunities which it could have pursued with the funds used by the defendants. To charge the defendants with 18% interest beyond that point would be improper, because the rationale for allowing such interest would no longer apply. I am persuaded that the point in time at which to cut off charging defendants with interest at 18% was June 11, 1980, the date on which I filed

---

6. Defendant Garfinkle had objected, as well, to the master's findings on rental income, but has since withdrawn those objections.

my opinion holding that Levin was entitled to an accounting. Defendants continued to have the use of the funds through that time, and persisted in their refusal to render an accounting to Levin for his share, despite their acknowledgment that such an accounting was due. Plainly, however, Rondi River was not actively engaged in business beyond that time.

Levin is therefore entitled to credit for his share of additional interest due to the corporation, at the rate of 18%, on $422,095, the adjusted amount of receivables due to the corporation from the defendants, from May 31, 1979, to June 11, 1980. This amounts to $78,276, of which Levin's share is $19,569.

Levin further objects to the master's reduction of his capital share from the $25,000 found to be Levin's share at trial, to $20,-000. The master's reason for reducing Levin's share was that Levin was able to produce from his financial records evidence of only $20,000 in contributions. Although I agree that the master was following sound accounting principles in refusing to credit Levin with more than $20,000, I choose to stand by my finding at trial that Levin contributed $25,000. The defendants there conceded that Levin made a $25,000 contribution, and because interests in property were often created between the parties without the exchange of cash in settlement of various other claims and obligations, the fact that Levin does not have records reflecting the full $25,000 does not mean that he did not in fact contribute it. The master's findings and conclusions will be adjusted to reflect the additional $5,000.

### G. Summary of Accounting, as Modified

In accordance with the above discussion, the following represents my findings and conclusions with respect to the Rondi River Realty Corporation:

| | Operations Rental 12/15/75– 9/30/76 | Interest Income & Expense 10/1/76– 6/11/80 | Gain on Sale R.E. 9/30/76 | Total |
|---|---|---|---|---|
| Operations per forecast 9½ mos. @ $10,000 | 95,000 | | | 95,000 |
| Gain on sale | | | 512,256 | 512,256 |
| Interest income | | 242,888 | | 242,888 |
| TOTAL | $95,000 | $242,888 | $512,256 | $850,144 |
| 25% to Levin | | | | 212,536 |
| Levin capital invested | | | | 25,000 |
| Loans from Levin and expenses paid by Levin | | | | 52,018 |
| Payments to Levin or on his behalf | | | | (16,000) |
| TOTAL share of Levin | | | | $273,554 |

### H. Form of Judgment

As modified, the master's report shows that Levin is entitled to $273,554 as his share of the Rondi River venture. This figure is somewhat misleading, however, because the "Gain on Sale" figure in the master's report includes the face value of a purchase money mortgage ($491,456) taken back by the Rondi River Realty Corporation at the time the Rondi River property was sold. Since that mortgage calls for a stream of payments through December 1, 1985, and because the master carried the value of the mortgage at its face amount throughout his accounting, the master recommended that judgment be entered entitling Levin to cash plus a 25% participatory interest in the purchase money mortgage.

Notwithstanding the master's recommendation that Levin's proportionate share of the Rondi River venture should reflect both the liquid and long-term assets of the corporation, I am inclined to reject his recommendation that Levin's judgment consist partly of a share in the purchase money mortgage. My reasons are twofold. First, it is the purpose of this litigation and of this accounting to terminate, once and for all, the relationship between Levin and the Garfinkle interests. To give Levin a share in the mortgage would frustrate this purpose. Second, because Garfinkle and Fensterheim unlawfully pledged the purchase money mortgage to secure several illicit loans from K. B. Weissman (see Findings 279–280, 492 F.Supp. at 805), the value of the purchase money mortgage is gradual-

ly diminishing. Therefore, in my view, the equitable way to resolve this matter is to value the purchase money mortgage as of June 11, 1980 (the date I found that an accounting should be rendered), reduce Levin's share proportionately to reflect the present value adjustment, and enter a money judgment in favor of Levin for the reduced amount.[7]

The parties were informed of my decision to adjust Levin's share to reflect the present value of the purchase money mortgage. Accordingly, on October 22, 1981, a hearing was held to determine, *inter alia*, the present value of the mortgage as of June 11, 1980. At the hearing, George David, Levin's expert, opined that the present value of the remaining payments under the mortgage was $356,893. In arriving at this figure, David applied a discount rate of 10%, which he described as the "return on cash" in 1976. David did not explain why a discount rate for 1976 should be applied to value a mortgage as of 1980. Defendants did not present any evidence whatsoever as to the present value in 1980 of the stream of payments to be paid under the mortgage, but did dispute the 10% discount rate applied by David. Asher Fensterheim testified that in the summer of 1980, second mortgages, like the purchase money mortgage involved here, were being discounted at rates of 22 to 24 percent.

Since the hearing, the parties have stipulated to the value, as of June 11, 1980, of the stream of payments to be generated by the purchase money mortgage from June 11, 1980 through December 1, 1985 for various rates of discount ranging from 10 to 24 percent.[8]

I must determine, therefore, which specific rate is applicable. From the little evidence presented at the October 22, 1981 hearing, it appears that discount rates on second mortgages in the summer of 1980 were somewhere in the 15–24% range. In other words, as of June 11, 1980, a reasonable investor would be willing to pay between seventy-six (76) and eighty-five (85) cents on the dollar for the remaining payments to be made under the purchase money mortgage. This differential is still substantial. However, it appears that the 15% rate of discount is on the low side since, as David admitted, discount rates on second mortgages in 1977 were in the 13 to 15 percent range. Rates in 1980 were certainly higher. However, I do not accept Fensterheim's testimony that the applicable rate was as high as 22%. Based on the limited evidence presented, I conclude that the proper rate falls somewhere between the two contentions and that the stream of payments to be generated by the mortgage from June 11, 1980 through December 1, 1985, should be discounted at the rate of 20%. At this rate, the value of those pay-

7. Levin objects to this approach, arguing that a liquidated judgment should be entered for the amount due him under the master's report as modified (*i.e.*, $273,554), without any downward adjustment for present valuation of the purchase money mortgage. Levin's argument rests on his contention that the purchase money mortgage, for all practical purposes, was lost as an asset of the Rondi River Realty Corporation when Garfinkle and Fensterheim pledged the mortgage to Weissman as security for loans which they used to their own personal advantage. I am not persuaded by Levin's argument that no adjustment should be made for the present value of the mortgage. Levin has not established to my satisfaction that the purchase money mortgage is now worthless to the corporation due to the improper encumbrance placed upon the mortgage by Garfinkle and Fensterheim. On the other hand, even if the corporation had full use of the mortgage today, given the present state of interest rates, it hard-

ly would be considered an attractive asset. The mortgage carries an interest rate of 7% and does not mature until December 1, 1985. Obviously, the face value of the remaining indebtedness on the mortgage does not reflect the current market value of the mortgage. Consequently, if no adjustment were made for present value, as Levin requests, a windfall would result to Levin.

8. The parties agree that if the mortgage is discounted, the proper discount rate falls somewhere within the 10 to 24 percent range. Levin, however, continues to maintain that his judgment should not be reduced to reflect the present value of the mortgage. *See* note 7 *supra*. Defendants, on the other hand, still contend that, if judgment is entered for Levin at all, it should consist partly of a share in the mortgage.

ments as of June 11, 1980 was $283,605.[9] This constitutes a $207,851 reduction in the value of the purchase money mortgage as reflected in the master's report. Therefore, since Levin must bear 25% of this reduction, his share in the Rondi River venture must be reduced by $51,962.75. Accordingly, I conclude that Levin is entitled to $221,-592.25 as his share of Rondi River. Judgment will be entered against Garfinkle and Fensterheim jointly and severally for this amount.

## I. *Interest*

■■■ Interest runs on a sum found to be due in an accounting from the date of the order requiring it. *Blum v. William Goldman Theatres, Inc.,* 174 F.2d 908 (3d Cir. 1949). Here, although the formal order directing an accounting was not entered until October, 1980, I made clear that Levin was entitled to an accounting in my findings of fact and conclusions of law filed on June 11, 1980. Conclusion of Law 26, 492 F.Supp. at 818–19, 820. Accordingly, legal interest will be added to the Rondi River judgment from that date.

## III. *Motion for Entry of Judgment Regarding the Indemnities*

As part of the unliquidated judgment entered in favor of Levin, I ordered Garfinkle to indemnity Levin for (1) one-half of all the amounts which Levin would be required to pay on account of a judgment against him with respect to a New Jersey property known as Bromley Estates, and (2) any portion of Garfinkle's $83,167 share in Levin's indebtedness to K. B. Weissman, which Levin would be required to pay because of Garfinkle's failure to make payment to Weissman. (*See* document 265). Averring that he has paid $15,000 on

account of the Bromley judgment and $149,407 to satisfy his debt to Weissman, Levin has now moved for the entry of a liquidated judgment in the amount of $90,-667 against Garfinkle, Huckleberry Farm, Inc., Country Realty, Inc., Czar Realty Corporation, TAFU, Inc., and HAW Corporation (document 462).

Insofar as judgment on the indemnities is sought against the corporations, I will deny Levin's motion for the reasons stated in Part I of this opinion. I will, however, grant Levin's motion for entry of judgment in favor of Bennett Levin against Howard Garfinkle in the further amount of $90,667, representing principal amounts for which indemnification is sought. There is no dispute as to the principal amounts.

On May 24, 1982, as I was preparing opinions to conclude all outstanding matters in this case, Levin filed still another motion entitled, "Motion to Include Further Interest in Judgment" (document 486). By this motion, Levin seeks indemnification from Garfinkle for a portion of the interest which Levin will be required to pay in order to satisfy the Weissman debt. Since it appears from the motion paper that the amount of interest has not yet been finally resolved between Levin and Weissman, and also because Garfinkle has not yet had the opportunity to respond to this most recent motion, I will not rule on the motion at this time and will await a response to the motion on Garfinkle's behalf.

## IV. *Outstanding Counterclaims*

■■ One further housekeeping matter needs to be attended. As mentioned earlier in this opinion, several defendants have filed counterclaims in both Civil Action No. 77–3211 and Civil Action No. 78–3271. Many of these have been dismissed volun-

---

**9.** As stated in note 7 *supra,* Levin disagrees with my decision to discount the purchase money mortgage to reflect its value as of June 11, 1980. But if I am going to do so, Levin argues that it is incorrect to consider only the discounted value of the mortgage payments made or to be made *after* June 11, 1980. Rather, Levin contends that I should add the "compounded" value of the mortgage payments made *before* June 11, 1980 to the discounted

value of the payments made subsequent to that date. While this approach may be theoretically preferable, I have determined to consider only the discounted value of the post-valuation date payments. The total amount of the earlier payments remains in dispute, and I have no way of determining the proper rate to apply in computing the future value of the pre-valuation date payments.

tarily pursuant to Fed.R.Civ.P. 41 (see documents 406 & 487), but no motions for voluntary dismissal have been filed on behalf of Howard Garfinkle and Norman Septimus in Civil Action No. 77–3211, and none on behalf of any of the named defendants in Civil Action No. 78–3271. Since no action has been taken to prosecute any of the counterclaims, I will dismiss all of the remaining counterclaims for failure to prosecute.

## ORDER

This 7th day of June, 1982, upon consideration of plaintiff's Consolidated Motion for Entry of Various Liquidated Judgments (document No. 475) [which incorporates plaintiff's Motions for Entry of Judgment against the Alter Ego Corporations (document No. 412); for Adoption of the Master's Report (document No. 436); and for Entry of Judgment Regarding Certain Indemnities (document No. 462)], it is

ORDERED that

1. the Motion for Entry of Judgment Pursuant to Rule 54(b) against the defendant Alter Ego Corporations is DENIED;

2. the Motion for Adoption of the Master's Report is GRANTED with the modifications noted in the opinion filed this date, and Judgment is entered in Civil Action No. 78–3271 in favor of Bennett Levin against Howard N. Garfinkle and Asher Fensterheim, jointly and severally, in the amount of $221,592.75, with interest at the rate of six percent (6%) per annum from June 11, 1980; and

3. the Motions for Entry of Judgment Regarding Certain Indemnities is GRANTED as to defendant Garfinkle and DENIED as to Alter Ego Corporations; and Judgment, in addition to that entered by Order dated November 26, 1980, is entered in Civil Action No. 77–3211 in favor of Bennett Levin against Howard N. Garfinkle in the amount of $90,667.

It is FURTHER ORDERED that

4. all counterclaims not heretofore voluntarily dismissed in Civil Actions Nos. 77–3211 and 78–3271 are DISMISSED for lack of prosecution;

5. the Court retains jurisdiction in Civil Action No. 78–3271 for the sole purpose of determining the liability of Bennett Levin for a share of any tax liability hereafter imposed by the Internal Revenue Service on the Rondi River Realty Corporation for the tax years 1976–1980 inclusive.